EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* AN-
THONY J. TURSI, acusado y apelante.

*Número:* CR-76-153      *Resuelto:* 18 de febrero de 1977

718

*Anthony J. Tursi, pro se; Elpidio Arcaya* y *Nicolás Torres Marrero,* abogados del apelante; *Roberto Armstrong, Jr., Procurador General Interino,* y *Candita R. Orlandi, Procuradora General Auxiliar,* abogados de El Pueblo.

PER CURIAM: Contra el apelante se formularon tres acusaciones por infracción de la Sec. 145(b) de la Ley de Contribución sobre Ingresos (13 L.P.R.A. sec. 3145(b)) consistente en que para los años de 1968, 1969 y 1970 rindió planillas falsas en las que a sabiendas ocultó una gran parte de sus ingresos, con el propósito de evadir y derrotar la contribución impuesta por ley. El caso fue a juicio ante jurado que trajo veredicto de culpabilidad en los tres cargos y el 18 de abril de 1975 el convicto fue sentenciado a la pena de 3 a 5 años de presidio en cada caso, a ser cumplidos en forma consecutiva.

En su alegato en apoyo del recurso de apelación, señala el acusado como errores: (1) violación de su derecho a un juicio justo e imparcial por publicidad adversa al acusado desplegada en la prensa, habiendo el Tribunal Superior denegado la moción de posposición del juicio; (2) privación de una defensa efectiva al denegarse moción de suspensión del juicio basada en enfermedad del abogado principal; (3) no haberle permitido a la defensa interrogar los jurados sobre posible prejuicio contra el acusado; (4) investigación incompleta por el tribunal de la queja de una jurado respecto a acercamientos de terceras personas en favor del acusado; (5) insuficiencia de la prueba de fraude; y (6) discrimen y negación al

acusado de la igual protección de las leyes inducida por pasión, prejuicio y parcialidad.

■ (1) Se queja el apelante de artículos y fotografías publicados en los diarios "El Vocero" y "El Nuevo Día" como un mes antes del juicio, en torno a su arresto y el de su hijo Phillip y allanamiento de su negocio por agentes federales por posesión ilegal de boletos de pasaje de una línea aérea comercial. Aparte de que el objeto de estos reportajes y el texto de lo publicado no tenía relación alguna con los delitos fiscales por los que se procesó al apelante, éste tuvo amplia oportunidad en el *voir dire* para examinar los candidatos a jurado y los finalmente aceptados no se mostraron prejuiciados contra el acusado. En Puerto Rico, donde el territorio es reducido y la población compacta, servida por medios de comunicación y difusión de eficacia máxima, sería imposible formar un jurado totalmente ignorante y desconocedor de alguno que otro detalle sobre la vida del acusado cuando éste, como en el caso del apelante, es persona que ha alcanzado connotación de figura pública. La justicia no puede por tanto depender de la ignorancia, sino de la integridad de los jurados y de la firmeza de su compromiso de resolver guiados únicamente por la prueba que se presente en juicio. Debemos añadir que la evidencia presentada contra el acusado fue de tal grado confiable y convincente que necesariamente desplazó, en el proceso deliberativo, todo otro elemento extraño a la estimación de la prueba.

■ (2) No hubo abuso de discreción por el juez al denegar la suspensión del juicio por enfermedad de uno de los defensores. El desarrollo del proceso así lo demostró pues dicha condición no afectó en modo alguno la militancia y habilidad de la defensa.

■ (3) El apelante lleva su impugnación del juicio al angosto extremo de no habérsele permitido preguntar en el *voir dire* si consideraban "inmoral" al dueño de cabaret en que según una información de "El Nuevo Día" se había pre-

sentado un espectáculo de coito en vivo. La defensa hizo labor de difusión porque pidió y obtuvo permiso para leerles la noticia al jurado acabada de salir, al segundo día del juicio. Ninguno expresó que la información revelada por el abogado afectara su determinación de resolver con objetividad y no erró el juez sentenciador al cualificar la pregunta de la defensa dirigiéndola a qué efecto, si alguno, tendría la noticia en la ecuanimidad e imparcialidad para juzgar libres de prejuicio.

■ (4) El incidente en que una jurado se quejó al juez de que a través de una medio hermana una tercera persona trató de influir sobre ella en favor del acusado, no tiene las proporciones que le atribuye la defensa. En ausencia del resto del jurado, el juez con la participación de fiscal y defensa, depuró el incidente, determinó su superficialidad y se cercioró de que ningún efecto había tenido en la imparcialidad de la jurado. Como expresáramos anteriormente, nos hubiese preocupado el episodio si la fragilidad o insuficiencia de la prueba diera lugar a inferir que el veredicto fue producto del prejuicio y no de la evidencia. No hay indicio de que eso haya ocurrido.

■ (5) El fraude imputado al acusado se comete al radicar a sabiendas una planilla falsa para evadir y derrotar la contribución. *Pueblo* v. *Franceschi,* 74 D.P.R. 825 (1953). Hubo prueba irrecusable por el Estado de que el apelante omitió en sus planillas cuantiosos ingresos, operó un negocio de hotel bajo el nombre de otra persona, no produjo libros de contabilidad, y usaba el nombre de Joseph Anthony en cuentas de banco y negocios. Esta cadena de actos integran la voluntariedad, que es elemento esencial del delito imputado al acusado. *Pueblo* v. *Calzada,* 93 D.P.R. 803 (1966); *Pueblo* v. *Rivera Adorno,* 99 D.P.R. 555 (1971). El fraude contributivo se identifica por la esciente evasión de la ley conducente a la derrota del sistema tributario. No exige ulteriores elementos formales de evidencia. "No vemos diferencia funda-

mental entre la no presunción de fraude y la regla general que exige preponderancia de evidencia para probar un hecho." *García López* v. *Méndez García*, 102 D.P.R. 383, 386 (1974).

▇ (6) Rechazamos por infundada la imputación de pasión, prejuicio y parcialidad dirigida contra el juez de instancia. Dicho magistrado condujo el juicio con corrección procesal y tolerancia para con una defensa particularmente enérgica.

*Estimamos que las sentencias impuestas deben cumplirse concurrentemente. Así modificadas las sentencias, se confirmarán.*

El Juez Asociado Señor Díaz Cruz radica opinión disidente y concurrente en parte con la cual concurren el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau.

—O—

Opinión concurrente y en parte disidente emitida por el Juez Asociado Señor Díaz Cruz en la que concurren el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 18 de febrero de 1977

Ante la posición más adelante expresada en esta disidencia, la mayoría ha acordado modificar las tres sentencias dictadas contra el apelante de 3 a 5 años de prisión al solo efecto de que en vez de consecutiva se cumplan concurrentemente. Concurro en la opinión *per curiam*, exceptuando el castigo impuesto. Es a lo que considero excesiva privación de libertad que va dirigida esta expresión disidente. En el amplio espectro de exacción por el agravio social la pena acordada por la mayoría está al margen de la valoración comparativa con delitos de mayor gravedad. En *Pueblo* v. *Ocasio Hernández*, confirmamos el 7 de febrero de 1977 sentencia de 3 a 6 años de presidio a un convicto por homicidio e infracción de la Ley

de Armas que mató a dos personas con revólver, puesto en probatoria. El acto de dar muerte ilegal a un semejante tiene mayor reproche jurídico y moral que el de escamotear las contribuciones. En el caso del apelante Tursi el sistema ha invertido la carga reprobatoria.

Las sentencias contra el apelante, aún reducidas por la disposición de concurrencia, constituyen un castigo desproporcionado e irrazonablemente severo en el momento en que se dictaron (18 de abril, 1975). *Pueblo* v. *Santos,* 67 D.P.R. 650, 657–8 (1947). Hay suficiente constancia en autos de que desde fecha anterior a la presentación de las acusaciones el 14 de febrero de 1974, el acusado hizo reiteradas gestiones ante el Departamento de Hacienda para resolver su caso administrativamente mediante el pago de deficiencias, intereses y penalidades. Su proposición no fue aceptada y en su lugar se le sometió a proceso criminal por delito grave a tenor de la Sec. 145 (b) de la Ley de Contribución sobre Ingresos que es la Núm. 91 de 29 de junio, 1954 (13 L.P.R.A. sec. 3145 (b) ) y que en lo pertinente ordena: ". . . cualquier persona que voluntariamente intentare de algún modo evadir o derrotar cualquier contribución impuesta por este Subtítulo o el pago de la misma, en adición a otras penalidades provistas por ley, será culpable de delito grave y castigada con multa no mayor de $10,000 o reclusión por no más de 5 años en la institución penal que designe el Secretario de Justicia, o ambas penas, más las costas del proceso."

Tres meses después de sentenciado el apelante en el Tribunal Superior, se aprobó por la Asamblea Legislativa, con vigencia inmediata, la Ley Núm. 2 de 15 de julio, 1975, sobre Amnistía General Contributiva en cuya exposición de motivos se asevera que ". . . hay un número de ciudadanos que no han rendido planilla de contribución sobre ingresos o que no han declarado sus ingresos en forma correcta. Debido a la intensa campaña efectuada por el Departamento de Hacienda contra la evasión contributiva en todas sus formas, estos ciu-

dadanos que han incumplido con sus obligaciones fiscales en el pasado, temerosos de los resultados adversos que conllevaría el practicar la honradez mediante el pago correcto y justo de sus contribuciones, se inhiben de hacerlo. Resulta, por lo tanto, deseable para el bienestar público general que en este difícil momento de la historia económica de Puerto Rico, el Estado, atemperando su política fiscal a la realidad económica y social vigente, promueva una amnistía general contributiva con el doble propósito de proveerle la oportunidad a los ciudadanos que han faltado a su deber a rehabilitarse mediante la información de ingresos no declarados sin temor a sanciones civiles y penales. Se estaría aportando también al sostenimiento de servicios indispensables a la ciudadanía y generando actividad económica que puede redundar en la creación y conservación de empleos en la empresa privada. Se propone, además, como medida a fin con los propósitos antes mencionados, condonar el pago de intereses, penalidades y recargos a aquellos ciudadanos que adeuden contribuciones al Estado Libre Asociado de Puerto Rico, siempre y cuando paguen su deuda dentro de los límites de tiempo establecidos por esta ley." Leyes de 1975, Ed. Equity, Parte 2, págs. 643, 644. Se fijó la fecha límite de 15 de octubre de 1975 para acogerse a los beneficios de la Ley que le permitió a los evasores legitimar ingresos no declarados previo pago de una contribución especial de 15% del ingreso bruto ajustado, libre de intereses y penalidades civiles o criminales, extendiéndose la amnistía por la Sec. 2(b) de la Ley a los casos de fraude, con la limitación de que para éstos el relevo provisto no incluía intereses, recargos y penalidades acumuladas.

El principio de igual protección de las leyes encarna el ideal de que haya un solo estándar de justicia, de que la justicia opere sin desigualdades, existan([1]) o no leyes para im-

---

([1]) Ordena el Art. 4 del Código Penal de 1974 que si la ley vigente al *tiempo de cometerse el delito fuere distinta de la que exista al imponerse la sentencia, se aplicará siempre la más benigna.*

plementar la garantía constitucional. No armoniza con ese principio de igualdad ante la ley que por haber sido el apelante descubierto en su delincuencia fiscal poco antes que otros incursos en tan grave o mayor falta que la suya, tenga aquél que pagar con extendida privación de libertad en presidio lo que otros satisficieron con sólo desprenderse de una pequeña parte de los ingresos ocultos. La ley bajo la cual se juzgó al apelante, previsora en sus alternativas de multa o prisión, dejó en manos del juez la elección del castigo, (²) que en este caso debe atemperarse a la "política fiscal" y a la "realidad económica y social vigente" de que nos habla el legislador en la exposición de motivos de la Ley Núm. 2 de 15 de julio, 1975. La sentencia en un caso penal debe reflejar la intensidad de la ofensa según la sancionan la ley y el concepto ético social prevaleciente. La individuación de la pena no ha de erigir purgatorios para expiación de todos los pecados del convicto. Estamos a tiempo para corregir la emergente inequidad del sistema.

Con estos antecedentes y fundamentos dejaría sin efecto las sentencias dictadas por el Tribunal Superior, Sala de San Juan, en sus casos Núms. G-74-303, G-74-304 y G-74-305, y en su lugar dictaría nueva sentencia imponiendo al acusado la pena de 1 a 2 años de prisión y $5,000 de multa en cada caso, concurrente en los términos de prisión, más las costas del proceso.

---

(²) El juez sentenciador no pudo ponderar la situación de igual protección de las leyes que ahora destacamos porque él dictó sentencia el 18 de abril de 1975 y los relevantes pronunciamientos justificativos de la amnistía contributiva se hicieron al aprobarse ésta el 15 de julio siguiente.