EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RA-
FAEL DONES ARROYO, c/p RAFI DONES, acusado y ape-
lante.

*Número:* CR-76-185 *Resuelto:* 30 de septiembre de 1977

*Wilfredo Figueroa Vélez* y *José Torres Ortiz,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General, Roberto Armstrong, Jr., Procurador General Interino, Justo Gorbea Varona* y *Américo Serra, Procuradores Generales Auxiliares,* abogados de El Pueblo.

PER CURIAM: Pablo N. Padilla debía comparecer al tribunal el 17 de diciembre de 1974 como testigo de cargo en un caso de drogas que se seguía contra el apelante Rafael Dones Arroyo. Tres días antes del juicio fue asesinado frente al negocio donde trabajaba. Todo lo que pudo observar su patrono tras oír los disparos, fue un carro deportivo amarillo que se alejaba del lugar.

Rafael Dones fue acusado por los hechos aunque no fue el autor material de los mismos. Sostuvo el Pueblo que Dones contrató los servicios de dos asesinos a sueldo para que realizaran la faena.

Para probar la conspiración los fiscales contaron con el testimonio de Ana Delia Pérez Colón, concubina que fue de Juliá, autor material del delito. Este fue descrito, aun por los testigos de defensa, como experto tirador.

Declaró Ana Delia que para noviembre de 1974 vivía con Angel Juliá en un apartamiento del Condado. Un viernes

de ese mes fueron hasta Piñones a una lancha donde estaba una persona que le presentaron como Rafi Dones. Ella quedó a una distancia de ocho a nueve pies de donde los hombres estaban hablando y oyó a Dones ofrecerle un trabajo a Juliá y a éste agradecerlo por estar corto de dinero. Al otro día, sábado, llegó Dones al apartamiento del Condado con un maletín lleno de dinero y en compañía de un individuo conocido por Paso Fino. Conversaron los tres, Dones, Juliá y Paso Fino como a 6 pies de donde se encontraba la testigo preparando un sandwich. Oyó cuando Dones le dijo a Juliá que "Pablo Padilla le tenía un caso de drogas y le había ofrecido dinero y no lo había querido aceptar, que lo mejor era tumbarle la cabeza dos o tres días antes del juicio y que si tenía carro y arma preparada." Luego le entregó el maletín a Juliá y se marchó con Paso Fino. A solas, la testigo acusó a Juliá de ser un asesino por dinero y éste le respondió con una bofetada y cinco billetes de cien dólares.

Para el 13 de diciembre de 1974 ya habían dejado el apartamiento del Condado y vivían en casa de un primo de ella. El 13 de diciembre fueron a la playa acompañados de Paso Fino, buscaron arena y se quedaron a dormir en otro apartamiento en el Condado. Al día siguiente, Juliá y Paso Fino vestidos de negro, con peluca y guantes, metieron dentro de un carro deportivo de color amarillo un rifle y una funda llena de arena. Fueron hasta la casa de la mamá de Dones. Allí entraron en un cuarto donde la testigo observó un radio parecido a otro que había visto en la lancha que visitó en Piñones. Oyó cuando Juliá, luego de poner a funcionar el radio, dijo "ya lo tenemos todo listo, el hombre se va de 4 a 3." Acto seguido Juliá se dirigió a Paso Fino indicándole que "ya Rafi dio la orden."

Luego la llevaron a casa de su primo y quedaron en verse en una boda que se celebraba esa noche. Juliá y Paso Fino llegaron a la boda en un *jeep* rojo y el primero le manifestó a la testigo que ya habían hecho el trabajo de Pablo Padilla y

si venían los "camarones" que les dijera que no lo había visto. Paso Fino se pasó el dedo por el cuello y se echó a reír.

Un día, a principios de 1975, cuando ya no vivía con Juliá, éste la amenazó y le dio una golpiza. Su nuevo amante, Benigno, la llevó al Cuartel de la Policía de Bayamón, a reportar el incidente. Allí entró en contacto con el CIC y eventualmente dio la declaración que llevó al arresto de Dones. Hasta ese momento el temor no le había permitido relatar a persona alguna lo que sabía. Para abril de 1975, Paso Fino y Juliá murieron en un encuentro con la policía.

En la repregunta, que duró casi tres días, Ana Delia se reafirmó en todo lo dicho durante el directo y aportó nuevos detalles sobre la intervención de Dones en la conspiración, tales como que Dones le suplió a Juliá una lista de direcciones en donde se podía conseguir a Padilla; que Dones dijo que el dinero que había en el maletín era sólo un adelanto; y el consejo que le dio a Juliá de que se fuera para Santo Domingo después "del trabajo" y que él (Dones) se iría para Nueva York.

La defensa presentó abundante prueba, entre ella el testimonio de familiares de Ana Delia y de su ex-amante Benigno, con el propósito de impugnar la declaración de la testigo. También presentaron prueba de coartada mediante el testimonio del Lic. Noriega. Este último declaró que el 14 de diciembre de 1974 se encontraba en la isla de San Martín como invitado de Dones. Estuvieron juntos desde las 8:30 de la mañana hasta las 11:00 de la noche, hora en que cada uno se fue para su cuarto. En todo ese tiempo Dones no llamó ni recibió llamada alguna y en el cuarto no había radio-teléfono.

Resulta evidente que la prueba de defensa no le mereció crédito al jurado ya que encontró al acusado culpable de asesinato en primer grado e infracción al Art. 8 de la Ley de Armas. El juez de instancia lo encontró culpable de una infracción al Art. 6 de la misma ley.

En dos extensos alegatos firmados por distintos abogados,

el apelante señala un total de 45 errores, los cuales hemos resumido y agrupado para facilitar su análisis y discusión:

(1) Admitir en evidencia actos y admisiones de un co-conspirador ya fallecido a la fecha del juicio, realizados en ausencia del conspirador acusado, antes de la conspiración y luego de terminada la misma.—Se refiere el apelante a un incidente en Ia Isla de Culebra, anterior al momento en que Juliá entró en conversaciones con Dones. Ana Delia situó a Juliá realizando prácticas de tiro en la referida isla. El segundo incidente se refiere a la llegada de Juliá a la boda luego de asesinar a Padilla y lo que le manifestó a Ana Delia según ya narramos.

■ Antes de entrar a examinar los dos incidentes señalados por el apelante, debemos dejar claro que la muerte de Juliá, bajo los hechos del caso, no hace inadmisible de por sí lo que hubiese manifestado a terceras personas. V Wigmore, *On Evidence*, sec. 1456, pág. 326, ed. 1974. Además, como ya hemos visto, de acuerdo al testimonio de Ana Delia estos incidentes no constituyen la única prueba contra Dones. Según la testigo ella se enteró de la conspiración por boca del propio Dones.

■ Respecto al primer incidente, el cual sólo prueba la pericia de Juliá con las armas, dato relevante a su aptitud para ejecutar el crimen y que de por sí en nada compromete a Dones, es a todas luces infundada la protesta del apelante ya que sus defensores repreguntaron a la testigo extensamente sobre el particular y la testigo de defensa Enid Ramos Colón declaró a los efectos de haber visto los diplomas de experto tirador otorgados por el Ejército a Juliá.

■ En cuanto al segundo incidente referente a las manifestaciones de Juliá a Ana Delia cuando se encontraron en la boda, basta decir que la conspiración no termina necesariamente con la comisión del delito. Las manifestaciones del co-conspirador Juliá fueron hechas tan próximas al tiempo de cometer el delito que forman parte del *res gestae* y como

tales admisibles contra el acusado ya que tienden a confirmar la conspiración y demuestran la intención de las partes. 3 Wharton, *Criminal Evidence*, sec. 643, págs. 338–339, 13th ed.; *Pueblo* v. *Castro*, 75 D.P.R. 672, 685 (1953); *Pueblo* v. *Orona Merced*, 89 D.P.R. 336, 338 (1963).

(2) Conducta impropia del juez que presidió la vista, de los fiscales y del Cuerpo de Investigaciones Criminales. —Alega que el juez hizo gestos que denotaban incredulidad (arquear las cejas) al recibirse el testimonio de uno de los testigos de defensa. No hay constancia en autos del desarrollo del incidente según lo narra el apelante, mas considerándolo tal cual lo alega, no se cometió el error. No puede presumirse que un jurado sea tan susceptible y falto de entereza, al punto de ser influenciado por un gesto pasajero e involuntario, el cual puede denotar infinidad de emociones a las que estamos sujetos todos los seres humanos, inclusive los jueces. *Pueblo* v. *Andrades González*, 83 D.P.R. 849, 860 (1961). El arqueo de cejas no siempre es signo de incredulidad. También es indicio de asombro, preocupación, abatimiento, tristeza, resignación, y hasta esfuerzo por desalojar una partícula molestosa de un ojo. Tampoco puede inferirse que el juez invadió las funciones del jurado al manifestar a éste que un testigo había declarado que el auto que vio alejándose del lugar de los hechos era un Camaro. El testigo declaró le pareció Camaro, mas no podía afirmarlo pero sí estaba seguro era un auto deportivo amarillo. De ser cierta la manifestación del juez al jurado, lo cual no surge de autos, y asumiendo que la aseveración no fuese del todo correcta, la misma no le causó perjuicio al apelante. Para efectos de los méritos del caso lo que importaba era la descripción del auto, no el nombre que le dio su fabricante. Si a esto unimos que el auto fue un detalle secundario, ni tan siquiera elemento para identificar o relacionar al acusado con el delito, es patente la frivolidad del señalamiento. El comentario del juez fue intrascendente, carente del efecto de prejuiciar al jurado contra el

acusado privándole de su derecho a un juicio justo e imparcial. *Pueblo* v. *Lampón,* 78 D.P.R. 109, 113 (1955). Tampoco se coartó el derecho del acusado a impugnar al testigo. Surge de autos todo lo contrario. Fue ampliamente contrainterrogado y a pesar de todos los esfuerzos de la defensa fue consistente en su testimonio.

 Según el acusado la conducta impropia del fiscal consistió en que en su turno de informe, éste hizo ciertas manifestaciones que menospreciaban y ponían en tela de juicio la prueba y testigos de defensa. Se queja de que el tribunal no permitió a la defensa objetar los comentarios. Asumiendo el fiscal hiciera las manifestaciones que reseña el apelante (por ejemplo, tildó de novela la prueba de defensa) la norma en nuestra jurisdicción es a los efectos de que en los informes al jurado, tanto defensa como fiscal tienen amplia libertad para comentar la evidencia y que aun las vituperaciones e invectivas, si bien constituyen un recurso de pobre estilo, no vician el veredicto si, como en el presente caso, no tienen la dimensión de factor determinante del mismo. El juez que preside la vista tiene amplia discreción para dirigir esta etapa de los procedimientos. Aun en el supuesto de que el fiscal hubiese hecho manifestaciones impropias el error no conlleva la revocación[1] a menos que el apelante demuestre que el veredicto fue influenciado por la conducta impropia. El caso de autos carece de tal prueba. *Pueblo* v. *Fournier,* 80 D.P.R. 390, 408–409 (1958); *Pueblo* v. *Rivera,* 98 D.P.R. 163, 168 (1969).

 La conducta impropia del CIC según el apelante consistió en acudir estos en masa al tribunal, arrestando en sus pasillos a un primo del apelante y a un empleado de uno de

---

[1] Informes al jurado dentro de los límites establecidos en *Fournier,* supra, no constituyen error revocable debido a que no es lógico suponer que los jurados sean personas de sensibilidad tan extrema que cualquier expresión o incidente, aun en casos de asesinato, les afecte el ánimo de tal forma que les impida rendir un veredicto imparcial. *Pueblo* v. *Hernández Santiago,* 97 D.P.R. 522, 531 (1969).

los defensores. El legajo de sentencia no revela los motivos y el número de agentes que asistía al tribunal. Sólo surge de autos la supuesta intervención con un empleado de los defensores, la cual se puso en conocimiento del tribunal ausente el jurado (Minuta de 26 de diciembre de 1975). Carece de méritos el señalamiento toda vez que no se demostró conocimiento de los incidentes por parte del jurado.

Examinados los autos que comprenden dos distintos resúmenes de la prueba que no fueron aprobados por el tribunal, no encontramos la represión y violación de derechos del acusado y sus abogados de que se queja el apelante.

 (3) No admitir y eliminar prueba tendente a impugnar el testimonio de la principal testigo de cargo.—Específicamente: (a) prueba sobre supuesta conspiración del CIC para ejecutar a los dos co-conspiradores como parte de las ofertas que hicieran a Ana Delia. No procedía esta prueba por ser irrelevante a los hechos del caso. Allí no se juzgaba al CIC por la muerte de Juliá y Paso Fino. Además, resultaba acumulativa a los efectos de impugnación ya que la defensa presentó otra prueba sobre supuestas ofertas que le hiciera el CIC con el propósito de refutar la declaración de la testigo negando las mismas. Fue tan profusa la prueba de impugnación del testimonio de esta mujer, en gran parte producida por sus familiares más cercanos, y aún así desechada por el jurado, que en nada podía mejorar la posición del acusado la admisión de improbables promesas por el CIC a Ana Delia de que la protegerían eliminando a Juliá y Paso Fino. Más que éstos, el apelante Dones debía ser la fuente de temor a represalia para dicha testigo. La exclusión de dicha prueba, en todo caso, no afectó el proceso ni en modo alguno fue perjudicial al apelante. *Pueblo* v. *Martínez Lucena*, 92 D.P.R. 881 (1965). (b) Récord de investigación de la Policía referente a Paso Fino, Juliá y Pablo N. Padilla. Según alega el apelante, el juez de instancia, a solicitud de la defensa, mandó a buscar dichos récords, los examinó, los negó a la

defensa y los mandó a devolver a la Policía por constituir materia confidencial. También negó la solicitud de que quedaran en récord como evidencia ofrecida y no admitida. El derecho al descubrimiento de prueba por parte del acusado no es absoluto, descansa en la sana discreción del tribunal y, entre los elementos a considerar al establecer el balance entre los derechos del acusado y los intereses del Estado, según resolvimos en *Pueblo* v. *Tribunal Superior*, 102 D.P.R. 470, 479 (1974), figuran la confidencialidad de lo solicitado y la pertinencia para el acusado. Este último no nos ha demostrado que el juez abusara de su discreción ni el perjuicio que le causara la negativa. (c) Récord de la Corporación de Renovación Urbana y Vivienda para impugnar el testimonio de Ana Delia. Alega que le era necesario para impugnar a la testigo y el tribunal se negó a admitirlo. Examinado el resumen de la prueba aprobado por el tribunal encontramos que lo que intentaba probar con este récord lo logró o pudo lograrlo durante el prolongado contrainterrogatorio a que sometió a Ana Delia y los numerosos testigos de defensa presentados para contradecir a la testigo. Por ejemplo, alega que con el récord pudo haber probado que Ana Delia había manifestado a la CRUV que trabajaba y recibía ingresos, lo que según alega, resulta inconsistente con la declaración de la testigo durante el juicio a los efectos de que nunca había trabajado. La testigo de defensa Julia Rivera Hernández declaró sobre el particular; aseguró que Ana Delia trabajaba en una barra y se le pagaba por su labor. La denegatoria del tribunal no perjudicó al apelante. (d) Preguntas a la testigo Ana Delia referente a dónde vivía. Alega fue error no permitir al acusado preguntarle a la testigo su dirección. Se basa en *Alford* v. *United States*, 282 U.S. 687, 694 (1931). La razón para reconocer el derecho del acusado a esta pregunta es que mediante la misma se sitúa al testigo en su medio ambiente para beneficio del jurado y permite a la defensa investigar la reputación del testigo respecto a

veracidad dentro de su comunidad. De la prueba que ya reseñamos surge claro que en el caso de autos ambos objetivos se lograron mediante otros medios. Además, este derecho no es absoluto, quedando a discreción del tribunal el excluir preguntas que tiendan a hostigar, molestar o humillar al testigo. Art. 527, [Código de Enjuiciamiento Civil] Ley de Evidencia, 32 L.P.R.A. sec. 2183; *Alford* v. *United States*, supra. Entre estas preguntas improcedentes, se reconoce el derecho del tribunal a ejercer su discreción cuando puede inferirse, como en el caso de autos, que puede peligrar la seguridad personal del testigo si se descubre su residencia actual. *McGrath* v. *Vinzant*, 528 F.2d 681, 684 (1976), *cert.* denegado, 426 U.S. 902. (e) Declaración de la hermana de Ana Delia sobre supuestas relaciones amorosas de esta última con un agente del CIC, a quien conoció una vez comenzada la investigación que llevó al arresto de Dones. Surge de la minuta del 28 de enero de 1976 que la razón para excluir esta parte del testimonio de la testigo fue que no le constaban los hechos de propio y personal conocimiento. Tampoco vemos la pertinencia de la misma a los hechos del caso. No se cometió el error. (f) Eliminar la defensa de coartada. Consta de la minuta del 18 de noviembre de 1975 que el tribunal concedió 5 días adicionales a la defensa para contestar pliego de particulares del fiscal. Le apercibió que de no hacerlo así, eliminaría la defensa de coartada. No aparece actuación posterior del tribunal referente al asunto hasta la minuta del 28 de enero de 1976. Durante la vista del caso, al presentar la defensa al testigo Lic. Noriega, se opuso el fiscal fundándose en que no se había dado cumplimiento a la orden de 18 de noviembre de 1975. El tribunal dejó sin efecto la referida orden al permitir la declaración del testigo. Se admitió la prueba de coartada del acusado y en nada se afectaron sus derechos. (g) *Memory test* al que pretendía someter la defensa a la testigo Ana Delia. El incidente sobre este llamado *memory test* no surge de autos y según descrita la

prueba(²) a la pág. 45 del "alegato suplementario" actuó correctamente el tribunal al denegarla. El extenso contrainterrogatorio dio amplia oportunidad al acusado para probar la memoria de la testigo.

■ (4) Admitir prueba de referencia contra el acusado. —La viuda de Pablo N. Padilla declaró que el occiso estaba citado como testigo contra Dones en un caso de drogas. El apelante considera no debió admitirse esta parte del testimonio de la testigo. La frivolidad del apuntamiento se hace patente al ver el resumen de la prueba aprobada por el tribunal. La testigo sabía de la acusación porque acostumbraba leer la correspondencia. Tampoco constituyó error no permitir en repregunta el examen de esta testigo respecto a la razón por la cual Padilla ya no trabajaba para la policía, toda vez que la testigo no declaró sobre el particular en el directo.

(5) Permitir que un testigo de defensa se negara a contestar preguntas formuladas por la defensa y excusar a dicho testigo antes de terminar el directo.—Se trata de un periodista que de primera intención se negó a revelar su fuente de información. Surge de las minutas del 19 y 20 de enero de 1976 que contrario a lo manifestado por el apelante, se le permitió a la defensa interrogar al testigo sobre si fue Ana Delia Pérez Colón su fuente de información. La defensa continuó interrogando al testigo y luego de varios incidentes más, quedó finalmente excusado. Surge del resumen de la prueba aprobada por el tribunal que el testimonio del testigo fue eliminado, a solicitud de los fiscales, por ser irrelevante. Es significativo que ninguna de las dos exposiciones de la

---

(²) La misma consistía en "escribir en un pedazo de papel lo que ella alegaba haber escuchado en una de las conversaciones sostenidas por el acusado Dones Arroyo y Juliá Vilá y Rigoberto Cintrón y sobre las cuales ya había declarado. La idea era darle lectura al escrito, . . . seguir repreguntando a la testigo y transcurrido un término razonable, preguntar a la testigo que repitiera el escrito al que dimos lectura y que era la misma conversación que ella alegaba haber escuchado más de un año atrás."

prueba preparadas por la defensa y desaprobadas por el tribunal contienen resumen alguno del testimonio de este testigo y sin embargo en ambos alegatos se refieren al mismo en varias ocasiones. No se cometió el error.

(6) Declarar sin lugar una moción de inhibición bajo la Regla 76 de las de Procedimiento Criminal.—El fundamento para solicitar la inhibición fue el siguiente: el juez había venido en contacto con la prueba al presidir en la argumentación de varias mociones presentadas por las partes. Específicamente, tenía conocimiento de la declaración jurada prestada por Ana Delia. Con estos datos, la defensa infirió era probable que el juez hubiese formado juicio respecto a la prueba. El magistrado que presidió la vista de esta moción correctamente la declaró sin lugar. El mero contacto previo con la prueba no incapacita al juez para ver el caso en los méritos. El acusado tiene que demostrar afirmativa y específicamente en qué consiste el prejuicio y parcialidad para que prospere una moción bajo la Regla 76 (f). Alegaciones y conjeturas no son suficientes. *Pueblo* v. *Pacheco,* 83 D.P.R. 285, 288–291 (1961). Aun tiene menor importancia este contacto previo con la prueba cuando el caso, como lo fue el de autos, se ve ante jurado.

(7) Declarar sin lugar moción de desestimación bajo la Regla 64 (p), moción sobre especificación de particulares y moción bajo la Regla 95 de las de Procedimiento Criminal.— Ya anteriormente el apelante trajo a nuestra atención lo resuelto en instancia referente a las primeras dos mociones en la solicitud de *certiorari* O-75-534, recurso que denegamos el 19 de diciembre de 1975 en vista de la corrección de lo resuelto en instancia. El argumento en apelación, básicamente lo mismo que en el *certiorari,* no justifica alterar el anterior criterio. Tampoco constituyó error denegar lo solicitado al amparo de la Regla 95 por los mismos fundamentos expresados al discutir el error 3 (b).

■ (8) Declarar sin lugar moción de recusación general del jurado bajo la Regla 114 de Procedimiento Criminal fundada en que en el panel general de jurados no figuraban personas entre 18 y 21 años en violación de la Regla 96, según enmendada.—No señala perjuicio específico causádole por la ausencia de personas de estas edades entre sus juzgadores, sólo la ilegalidad del panel constituido según el apelante en violación de la ley. Examinada la Ley Núm. 15 de 5 de agosto de 1975, surge la frivolidad del señalamiento. Su exposición de motivos es preceptiva pero no conminatoria. La ley "permite que en la selección del jurado haya ciudadanos de dieciocho años de edad." El propósito de la misma fue meramente rebajar de 21 a 18 años el mínimo de edad necesario para actuar como jurado para poner la regla a tono con otra legislación que reconoce madurez a los jóvenes de 18. En otras palabras, la ley no hace obligatoria la inclusión de estas personas en el panel de jurados, como pretende el apelante, sólo las permite.

■ (9) Aceptar recusación motivada del fiscal de un miembro del jurado por motivo de amistad con uno de los abogados de defensa.—Sostiene éste no es fundamento suficiente para recusación motivada, debiendo demostrarse que la amistad es de tal naturaleza que impide al jurado usar su propio criterio. La Regla 121(e) establece como uno de los fundamentos para recusar motivadamente que el jurado "no puede juzgar la causa con completa imparcialidad." La amistad con el defensor lleva implícita el elemento de parcialidad que puede impedir el fiel descargo de su deber por el jurado. El grado de amistad y correlativa proclividad del jurado no ha de ser extremado para que el juez se decida a eliminar esta amenaza a la imparcialidad. No abusó de su discreción el tribunal al sostener la recusación. *Pueblo* v. *Gallart,* 11 D.P.R. 377, 381–382 (1906); *Pueblo* v. *Prados García,* 99 D.P.R. 384, 393 (1970).

 (10) Publicidad adversa, su efecto sobre el jurado y la eventual incomunicación (secuestro) del mismo.—Alega que se le privó de su derecho a juicio justo e imparcial al negarse el tribunal a interrogar los miembros del jurado respecto a si habían leído noticias relativas al acusado[3] publicadas durante el juicio y el efecto de tales noticias en su ánimo. Las publicaciones a que hace referencia no han sido elevadas con los autos del caso, no estamos en condiciones de juzgarlas. Esto de por sí sería suficiente para disponer del error pero velando por los derechos del apelante hemos estudiado las minutas del caso y de las mismas surge que el 20 de enero de 1976 la defensa se queja de un artículo publicado en "El Vocero" y solicita se interrogue y se instruya al jurado para determinar si procedía un *mistrial*. El fiscal se allanó a la solicitud de instrucciones de la defensa y el tribunal entendió que se debía dar instrucciones "en ese momento y posteriormente." Llamado el jurado a Sala, el tribunal les instruyó en relación a lo publicado en la prensa relacionado con el caso. La defensa no opuso reparo a la resolución e instrucciones impartidas por el tribunal. El 22 de enero vuelve la defensa a llamar la atención del tribunal por una información de prensa relativa al caso y solicita del tribunal que tome las medidas que crea conveniente, para que el acusado tenga un juicio justo e imparcial. Ante la situación el tribunal decide que va a tomar medidas para incomunicar el jurado y así evitar que les llegue alguna información. La defensa tampoco se opone en ese momento a la determinación del tribunal, aparte de que invocó su discreción al hacer el planteamiento. El 26 de enero nuevamente

---

[3] Lo dicho en *Pueblo* v. *Tursi*, 105 D.P.R. 717 (1977), dispone de esta parte del señalamiento. "En Puerto Rico, donde el territorio es reducido y la población compacta, servida por medios de comunicación y difusión de eficacia máxima, sería imposible formar un jurado totalmente ignorante. La justicia no puede por tanto depender de la ignorancia, sino de la integridad de los jurados y de la firmeza de su compromiso de resolver guiados únicamente por la prueba que se presente en el juicio."

hay reparo de la defensa a un artículo publicado en "El Vocero" y el tribunal hace constar que está haciendo gestiones para incomunicar el jurado de manera que no pueda oír radio, ver televisión o leer periódicos. No surge objeción de la defensa. Es al recesar hasta el día siguiente, y luego del juez expresar que va a secuestrar al jurado, que la defensa se opone por entender es perjudicial a los derechos del acusado, sugiere en la alternativa que se instruya al jurado con relación a los periódicos. Tanto el fiscal como la defensa argumentan en contra del secuestro, el tribunal no accede a la solicitud de las partes por entender la pureza de los procedimientos requiere el secuestro y hace constar le informará al jurado la decisión la tomó el tribunal motu proprio.

Como vemos, el tribunal con el consentimiento de la defensa optó por instruir al jurado sobre el particular, distinto a *United States* v. *Concepción Cueto*, (⁴) 515 F.2d 160, 164, citado por el apelante, donde se interrogó al jurado pero no se le dieron instrucciones específicas y *United States* v. *Pomponio*, 517 F.2d 460, 462, 463, también citado por el apelante. En este último caso por dos ocasiones el juez denegó solicitudes específicas de la defensa para interrogar al jurado respecto a si había leído cierta información periodística. En ambos casos el tribunal de apelación, como no ocurre en el de autos, tuvo ante sí las publicaciones al resolver que se había cometido error revocable.

En cuanto a la incomunicación del jurado, resulta evidente que era la única alternativa que le quedaba al tribunal ante los continuos reclamos de la defensa. Anuló cualquier posible reacción sicológica por parte del jurado detrimental al acusado, al informarles que la decisión se había tomado por iniciativa del propio tribunal.

---

(⁴) En la opinión de *Concepción Cueto*, supra, se reconoce que instrucciones enérgicas y específicas pueden subsanar cualquier efecto detrimental para el acusado si el jurado viene en contacto con publicidad adversa al acusado.

Relacionado con estos incidentes surge otro señalamiento consistente en que no se le permitió al acusado dirigirse personalmente al tribunal en relación a la información de prensa antes mencionada. Con cuatro defensores llevando el caso hábil y enérgicamente no vemos que más podía añadir el acusado en su favor. No abusó el tribunal de su discreción al negar permiso.

 (11) Traer al acusado esposado y bajarlo junto a otros presos frente a la entrada del tribunal, a la vista de jurados que esperaban entrar a Sala.—Sostiene debió dársele trato especial consistente en traerlo separado de los demás presos y entrarlo al tribunal por un lugar apartado de la vista de los jurados. El acusado admite no entraba a Sala esposado y no hay prueba de que la defensa llamara la atención del tribunal oportunamente, ni de que el jurado que entendió en el caso viese efectivamente al acusado en las condiciones que alega. En el supuesto de que hubiese puesto al tribunal en conocimiento de la situación y asumiendo para propósito de argumentación que no existe diferencia básica en cuanto a la restricción física del acusado si se encuentra dentro o fuera de Sala no ha demostrado abuso de discreción al denegar el tribunal su solicitud. (⁵)

(12) No conceder el *mistrial* solicitado por la defensa en dos ocasiones al enterarse que la testigo Ana Delia supuestamente se había entrevistado con sus hermanas Enid Ramos Colón y Lydia Esther Pérez Colón, testigos de defensa.— Según el apelante, estas entrevistas se llevaron a efecto en casa de la madre de las testigos, instigando allí Ana Delia a sus hermanas a cometer perjurio. No surge de las minutas del 7 y 8 de enero de 1976, ni del resumen de la prueba lo que

---

(⁵) El tribunal puede autorizar medidas restrictivas de la libertad de acción del acusado durante el juicio y que estén a la vista del jurado (esposas, grilletes) tomando en consideración hechos tales como convicciones anteriores del acusado y la naturaleza del delito que se le imputa. *Pueblo v. Rodríguez García*, 85 D.P.R. 467, 471 (1962).

habló, si fue que hubo tal conversación de Ana Delia con sus familiares cuando fue a visitarles. Lo que sí surge de las mencionadas minutas es que el tribunal investigó debidamente el asunto, desfilando prueba al efecto en ausencia del jurado. Debemos presumir, ausente prueba en contrario, que no encontró méritos en el planteamiento de la defensa al ordenar que continuaran los procedimientos. Asumiendo cierta la versión de la defensa, vemos que no surtieron efecto los reclamos de Ana Delia ya que sus hermanas declararon a favor de la defensa pretendiendo desmentir extremos de la declaración de la hermana testigo de cargo. En vista de los resultados poco fructíferos de la gestión, no podemos decir que sufrió perjuicio el apelante.

■ (13) Negativa e insuficiencia de instrucciones al jurado.—Alega que las instrucciones impartidas fueron inadecuadas pero no las elevó con los autos del caso, por lo tanto, no estamos en condiciones de juzgarlas, debiendo presumir que las mismas fueron correctas y ajustadas a derecho. En cuanto a la negativa de impartir instrucciones sobre corroboración del testimonio de Ana Delia, el propio apelante rebate el error al admitir a la pág. 58 del alegato suplementario ". . . la ley no exigía la corroboración del testimonio de la testigo principal, Ana Delia Pérez Colón . . . ."

■ (14) No permitir el tribunal que se eliminara un párrafo de la declaración jurada de la testigo Ana Delia, que según el apelante no era relevante a los hechos del caso, y así alterada utilizarla para impugnar a la testigo.—No surge el incidente de las dos versiones del testimonio de Ana Delia preparado por la defensa así como tampoco del resumen de la prueba aprobado por el tribunal. De la minuta del 2 de enero de 1976 surge el planteamiento de la defensa, mas no así el fallo del tribunal. Asumiendo que el incidente ocurrió como lo plantea el apelante, no nos ha demostrado el presente sea caso de excepción que amerite se altere la regla general en el sentido de que cuando parte de un escrito se ofreciere por

una de las partes, la totalidad del mismo podrá ser investigado por la otra. Art. 385 [Código de Enjuiciamiento Civil], Ley de Evidencia, 32 L.P.R.A. sec. 1666; *cf. Pueblo* v. *Díaz Díaz*, 86 D.P.R. 558, 562 (1962).

Por último, el apelante hace recapitulación de todos los errores ya señalados alegando que los mismos demuestran primero, que se le privó de un juicio justo e imparcial y segundo, que fue convicto con prueba increíble e insuficiente en derecho. El primer apuntamiento no requiere mayor análisis. El acusado tuvo un juicio justo libre de errores que pudieran afectar sus derechos fundamentales. La prueba contra él producida tiene detalles y pormenores que satisfacen los criterios de suficiencia y credibilidad. Son elementos básicos integrantes de dicha prueba: (1) admisiones incriminantes del acusado, no controvertidas por la defensa; (2) la aptitud de la testigo para oír las admisiones: se encontraba a corta distancia del lugar donde se conversaba y tenía motivo lógico y razonable para estar allí, era la concubina de uno de los contratantes, en algunas de las ocasiones se encontraba en su propio hogar y en otra acompañaba a su amante, invitado de Dones; y (3) en extremos críticos la propia prueba de defensa corrobora la de cargo: la testigo de defensa Enid Ramos Colón declaró que Dones visitaba el apartamiento del Condado donde vivían Ana Delia y Juliá; varios testigos de defensa declararon que Ana Delia llegó sola a la boda del 14 de diciembre de 1974, reuniéndose Juliá con ella por corto tiempo, y acompañado de Paso Fino, ya entrada la noche; y la testigo Enid también corroboró con su declaración el hecho de que Juliá poseía suficiente destreza con las armas para que el apelante le confiara el encargo. El jurado resolvió el conflicto de credibilidad entre unos y otros testimonios y su veredicto por ajustarse a derecho, debe ser respetado.

*Se confirmarán las sentencias apeladas.*

El Juez Asociado Señor Rigau no intervino.