EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ L. TORRES RIVERA, apelante.

*Números:* CR-87-123          *Resueltos:* 28 de junio de 1991
CE-89-34

*Juan Reyes Vélez*, abogado del apelante; *José Luis Torres Rivera, pro se; Rafael Ortiz Carrión* y *Jorge E. Pérez Díaz, Procuradores Generales, Norma Cotti Cruz, Procuradora General Interina,* y *Blanca Díaz Segarra, Procuradora General Auxiliar*, abogados de El Pueblo.

## SENTENCIA

### I

El 8 de diciembre de 1987 fue sentenciado el apelante, José L. Torres Rivera (c/p "Papo Penetration"), a ciento diecinueve (119) años de prisión por la comisión de los delitos de asesinato en primer grado, conspiración y varias infrac-

ciones a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418.([1])

Inconforme, el apelante presentó ante nos un escrito de apelación (CR–87–123) en el cual planteaba que el veredicto rendido por el Jurado fue contrario a la prueba desfilada durante el juicio y que éste estuvo influido por un informe de naturaleza opresiva ofrecido por el Ministerio Público. De igual manera, sostuvo que erró el foro de instancia al no permitirle explicar al Jurado el alcance de la Regla 156 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, en cuanto al testimonio del coautor.

Estando pendiente la aprobación de la exposición narrativa de la prueba, el 17 de agosto de 1987 el apelante presentó ante nos una moción de solicitud de nuevo juicio al amparo de las Reglas 192 y 192.1 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. En dicha solicitud adujo que durante la tramitación de su apelación había descubierto nueva evidencia que no había estado a su disposición al momento de celebrarse el juicio en su contra y que ameritaba la celebración de un nuevo juicio. Dicha evidencia consistía, básicamente, en un acuerdo logrado entre el coautor Héctor Manuel Delgado Rivera c/p "Mani") y el Ministerio Público, mediante el cual aquél haría alegación de culpabilidad por el delito de asesinato en segundo grado y cooperaría con la Fiscalía en calidad de testigo de cargo en el juicio que se ventilaría contra el apelante. A cambio, el Ministerio Público no se opondría a la solicitud de Mani para que se le fijara la pena mínima del asesinato en segundo grado (doce (12) años).

---

([1]) El foro de instancia le impuso noventa y nueve (99) años en el asesinato en primer grado; cinco (5) años por el cargo de conspiración a ser cumplidos concurrentemente con el de asesinato; diez (10) años por violación al Art. 8 y cuatro (4) años por violación al Art. 6, ambos de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 418 y 416, concurrentes entre sí pero consecutivos con los cargos de asesinato y de conspiración, y diez (10) años en otra violación al Art. 8, *supra*, así como otros cuatro (4) años por otra violación al Art. 6, *supra*, concurrentes entre sí pero consecutivos con las demás condenas.

El apelante alega que el Ministerio Público le ocultó la existencia de dicho acuerdo a pesar de que su defensor lo había solicitado en el descubrimiento de prueba. Aduce, además, que como consecuencia de ello se le negó la oportunidad de impugnar el testimonio del alegado coautor durante el juicio.

La otra nueva evidencia consistía en una declaración jurada, prestada por Mani con posterioridad al juicio, que exculpaba al apelante de la responsabilidad por la muerte de la víctima. Finalmente, adujo que el foro de instancia cometió un error al impartirle las instrucciones al Jurado.

El 25 de agosto de 1988 autorizamos al apelante a presentar la solicitud de nuevo juicio ante el foro de instancia y le ordenamos que nos mantuviera informados sobre el resultado de dicha solicitud.

Celebrada una vista evidenciaria, el foro de instancia denegó la solicitud de un nuevo juicio. El apelante acudió ante nos mediante recurso de *certiorari* (CE–89–34) cuestionando la determinación del foro de instancia sobre su moción de nuevo juicio. Aduce en esta ocasión que:

A. Erró la ilustrada sala al resolver que la prueba sobre el acuerdo entre la fiscalía y el testigo Héctor M. Delgado Rivera siempre estuvo disponible y que la defensa no fue diligente y por tal razón no aplicó lo resuelto en Giglio VS. U.S., 405 U.S. 150.
B. Erró la ilustrada sala al resolver que la declaración del testigo Héctor M. Delgado Rivera en corte abierta era poco creíble.
C. Erró la ilustrada sala al resolver que las instrucciones al jurado en este caso fueron correctas y que dicho planteamiento era uno tardío. Petición de *certiorari*, pág. 11.

Mediante trámite para mostrar causa, solicitamos al Procurador General que justificara por qué no debíamos revocar la resolución del foro de instancia que denegó un nuevo juicio.

El 22 de junio de 1989 consolidamos el recurso de apelación (CR–87–123) con el de *certiorari* (CE–89–34) y con-

cedimos al Procurador General un término para presentar su alegato en el recurso de apelación. El apelante ha presentado su alegato en apelación. El Procurador General ha hecho lo propio en el trámite para mostrar causa del *certiorari* y en el recurso de apelación. Estamos en condiciones de resolver y así lo hacemos.

## II

Veamos los hechos y la prueba que dieron fundamento a las acusaciones y a la convicción del apelante según surgen de los autos y de la exposición narrativa de la prueba. Ello nos permitirá poner los planteamientos del apelante en su justa perspectiva.

El domingo 23 de marzo de 1986 fue ultimado de dos (2) balazos el Sr. Félix Campos Maldonado (c/p "Félix El Grande") en el residencial público Virgilio Dávila de Bayamón. Por esa muerte fue acusado de asesinato en primer grado el Sr. Héctor Manuel Delgado Rivera (c/p "Mani"). En este caso, Mani se declaró culpable tras haber llegado a un acuerdo con el Ministerio Público para declarar como testigo de cargo en contra del autor intelectual del asesinato. Los términos de este acuerdo fueron recogidos en la Minuta de 29 de abril de 1987 (G–86–3037, 3038, 3039, 3103 y 3104) en casos contra Mani. Allí se expresa:

Manifiesta la defensa que en estos casos se ha llegado a un pre-acuerdo con el señor Fiscal de Distrito en el cual el caso por Asesinato en Primer Grado se rebajará a uno de Asesinato en Segundo Grado. Una vez así rebajado se entrará en alegación de culpabilidad por el mismo y se entrará además en alegación de culpabilidad por los delitos de Robo e Infracción a los Artículos 8, 7 y 6 (2) de la Ley de Armas según imputados. Hay una recomendación de una pena atenuada de Doce (12) años con una concurrencia entre estos casos en ánimo de que el señor imputado aporte una información para la detención del co-autor intelectual de estos hechos.

El Fiscal de Distrito solicita que en vista de que este acuerdo

contiene información con relación a una investigación que se realizará solicita el desalojo de la sala.

Con la anuencia de la defensa así se ordena.

Manifiesta el Ministerio Fiscal que el acuerdo, y que son las razones por las cuales se ha accedido a la reclasificación del delito de Asesinato en Primer Grado a uno de Asesinato en Segundo Grado, es que el acusado ha manifestado que tiene información que corroborada por las autoridades investigativas pertinentes podrían dar lugar a que se sometiera a la consideración de un Magistrado prueba con la cual se encuentre causa para el arresto de otra persona que conjuntamente con el acusado cometió los hechos. Hace constar que hubo otra persona que también conjuntamente cometió los hechos y ya falleció. Esta investigación daría con el responsable intelectual de este asesinato. En la medida de que el imputado proporcione prueba relacionada con el arresto de otra persona, de la persona responsable de la planificación intelectual de este asesinato. Por tal razón es que se ha accedido a la pena mínima en estos casos y la concurrencia en los mismos. Hay además un compromiso de hacer las gestiones con la Administración de Corrección para que el acusado sea colocado en aquella institución que mejor garantice su seguridad.

El Tribunal tiene ante sí Moción sobre Alegación pre-acordada suscrita por las partes en la cual se hace constar el acuerdo habido y el Tribunal luego de interrogar al imputado en cuanto al mismo aprueba dicho acuerdo en principio sujeto a la aprobación de la alegación de culpabilidad. *Exhibit* V, pág. 10.

El Ministerio Fiscal estuvo representado en estos casos por el Lcdo. Luis Jiménez Reverón.

A base del testimonio brindado al Ministerio Público por Mani se presentaron las denuncias por asesinato en primer grado y por varias violaciones de la Ley de Armas de Puerto Rico contra el apelante.

Durante el juicio por esos cargos, Mani testificó como testigo de cargo e identificó al apelante como el autor intelectual de los hechos. Atestó que él y Santiago "Chago" Quiles eran gatilleros; que se dedicaban a matar por contrato a cambio de drogas y de dinero. Durante el tiempo en que conoció a Chago Quiles, habían matado a cinco (5) o seis (6) personas por encargo de otros. Tanto él como su "socio"

eran drogadictos y se habían conocido en el hogar juvenil. Allí conocieron a un tal "Mosquito".

El testigo de cargo había conocido al apelante antes de que éste lo contratara para matar porque le había vendido droga varias veces. Testificó que el día de los hechos se encontraba en casa de Manolete en compañía de Chago Quiles y la viuda de Manolete. Allí se presentó Mosquito para informarles que el apelante quería hablar con ellos. Los tres (3) se dirigieron al residencial Virgilio Dávila, donde se reunieron con el apelante detrás de uno de los edificios del residencial. El apelante alegadamente les dijo que le iba a dar un paquete de droga y $500 para que mataran a Félix El Grande. Además, les daría $2,000 si le entregaban el reloj "Juvenia" de Félix El Grande.

Según el testigo, el apelante y Félix El Grande eran "tiradores" de droga y la razón para matar a este último era el control de su "punto" en el residencial.

Luego de esta reunión, salieron en busca de Félix El Grande. Al encontrarlo, simularon un robo a su persona y, luego de despojarlo del reloj "Juvenia" y de varias cadenas de oro, Chago Quiles le hizo un disparo que le traspasó el cuello. Al caerse al piso, el testigo le hizo un disparo en la cara para "arremacharlo".

Perpetrados los hechos, se fueron a esconder a casa de José Osorio Rivera (c/p "Tatito"). Allí hicieron uso de drogas y luego se presentó el apelante con un paquete de droga y $500 para cada uno. El testigo y Chago Quiles le entregaron el reloj "Juvenia" y el apelante les dijo que iba a buscar un carro para sacarlos del residencial y que fueran al otro día a buscar los $2,000.

El apelante salió del apartamento de Tatito y trajo un Toyota rojo de cuatro (4) puertas, en el que salieron del

residencial Mani, Chago Quiles y el apelante.(²) De allí se dirigieron a casa de Manolete.

El 13 de agosto de 1986 el testigo fue arrestado y acusado de asesinato por esos hechos. Ya en la cárcel —continuó testificando— intentó fugarse, ya que temía por su vida. Durante el contrainterrogatorio, Mani negó que entre él y el Ministerio Público existiera un acuerdo para que declarara en contra del apelante.

Por su relevancia con respecto al acuerdo entre el testigo de cargo Héctor M. Delgado y el Ministerio Público, relatamos la cronología de eventos ocurridos en el proceso llevado en su contra por la muerte de Félix El Grande. Mani fue arrestado por esos hechos el 13 de agosto de 1986.

El 29 de abril de 1987, según surge de la minuta de ese día, la defensa informó al tribunal sobre el acuerdo concertado con la Fiscalía para que Mani testificara en contra del apelante. El Ministerio Público, representado por el Fiscal Luis Jiménez Reverón, informó al tribunal que accedió a solicitar la pena mínima para el asesinato en segundo grado, así como la concurrencia de las penas.

El entonces acusado, Mani, hizo alegación de culpabilidad en todos los cargos. El foro de instancia, luego del examen de rigor, aceptó la alegación de culpabilidad y declaró a Mani culpable de los delitos imputados.

El 31 de julio de 1987 el foro de instancia sentenció a Mani a cumplir una sentencia de treinta y cinco (35) años de cárcel. Ya el 13 de julio de 1987 se había presentado la acusación contra el apelante. El 12 de noviembre comenzó el juicio en su contra.

En diciembre de 1987, luego de Mani haber declarado contra el apelante, es que la defensa de Mani solicita la

---

(²) El día y en el lugar de los hechos mataron también al individuo identificado como "Mosquito". En julio de 1986, en la Barriada Cucharillas del Municipio de Cataño, encontró la muerte Santiago "Chago" Quiles.

reconsideración de la sentencia para conformar la pena impuesta a la solicitada por el fiscal para llegar a la alegación preacordada.

Según testificara el juez que presidió el proceso contra Mani (Hon. Félix Ortiz Juan), le impuso una pena de treinta y cinco (35) años y no accedió a la solicitada en el acuerdo original "debido a que se trataba de una serie de muertes y le parecía insensato imponer una sentencia de 12 años por el mero hecho de que había un acuerdo entre el fiscal y esa persona ...". Petición de *certiorari*, pág. 8.

El 25 de marzo de 1988 el Honorable Juez Ortiz Juan acogió la moción de reconsideración de sentencia instada por Mani, ya que se estableció "el hecho de que dicho acusado había declarado según lo acordado originalmente contra el autor intelectual del crimen ...". (Énfasis suprimido.) Moción de reconsideración, pág. 6.

Durante el juicio, los otros dos (2) testigos de cargo fueron el Sr. Ildefonso Avilés, hijo del occiso, y el agente Pedro Albino.

El señor Avilés testificó que el día de los hechos pasaron frente a él, por la casa de su padre, Mani y Chago Quiles portando dos (2) armas. Luego escuchó dos (2) tiros, salió de su casa y vió a su padre tirado en el suelo, todo ensangrentado. Sin embargo, ese día no vio al apelante por el residencial público.

El agente Albino declaró que el día de los hechos recibió una llamada en su carro donde le indicaban que pasara por el Hospital Municipal de Bayamón, ya que allí había una persona muerta; que esa persona resultó ser Félix El Grande, quien presentaba dos (2) impactos de bala, uno en el lado derecho del cuello y otro en el lado izquierdo de la cara. Luego de realizar la investigación pertinente, identificó a Mani y a Chago Quiles como los autores materiales del crimen. A preguntas de la defensa atestó que, en la vista preliminar en contra de Mani, éste no declaró nada con relación a esa muerte y que fue hasta comenzado el

juicio en su contra que Mani decide declarar. Testificó que desconocía si existía un acuerdo entre el Ministerio Público y Mani para declarar en contra del apelante. Continuó testificando "[q]ue como resultado de su investigación determinó que el móvil del asesinato había sido el punto de drogas que tenía Félix El Grande en el residencial". Relación narrativa de la prueba desfilada, pág. 5. Sostuvo, además, que supo que el apelante era el autor intelectual del asesinato por una declaración prestada por Mani después de haberse declarado culpable.

La defensa del apelante trajo como testigo a José Osorio Rivera (c/p "Tatito") y a Víctor Manuel Pérez Sevilla (c/p "Natito").[3]

Tatito declaró que conoció a Mani y a Chago Quiles en el hogar juvenil y al apelante en el residencial Virgilio Dávila. Según el testigo, el día de los hechos se encontraba en su apartamento del Residencial Virgilio Dávila en compañía de su padre y de Natito. A eso del mediodía llegaron allí el individuo identificado como Mosquito, Mani y Chago Quiles. Mosquito le pidió que abriera la puerta y los dejar entrar. Él los dejó entrar. Ya dentro del apartamento se fueron a su cuarto a consumir drogas ("curarse"). Allí, Mani y Chago sacaron prendas, dinero, dos (2) pistolas y le explicaron que habían matado a Félix El Grande porque se había resistido al robo ("cañona") y que, si no lo mataban, él los podía matar a ellos. Declaró que, entonces, lo mandaron a comprar drogas ("capear") mientras ellos se quedaban en el cuarto. Al salir, vio a Natito en la escalera de la entrada del edificio por donde tiene que entrar y salir cualquier persona que entre o salga del apartamento. Compró la droga y regresó al apartamento. Natito aún permanecía en la escalera. Al llegar al cuarto, todos los que allí estaban hicieron uso de drogas. Luego Mosquito salió a buscar a

---

[3] Testificó, además, la madre del acusado sobre aspectos impertinentes a esta apelación.

alguien para sacar a Mani y a Chago Quiles del residencial. Al regresar se llevó a Mani y a Chago en el carro de Natito.

Según este testigo, el apelante nunca estuvo el día de los hechos en su apartamento. A preguntas del Ministerio Público declaró que no dijo nada de esto a la Policía por temor a represalias contra su familia.

Como último testigo de la defensa declaró Natito, quien, según atestó, se encontraba en el apartamento de Tatito el día de los hechos arreglando una lavadora. Testificó que estando allí oyó a Mosquito llamar a Tatito para que le abriese la puerta del apartamento. Vio cuando Tatito abrió la puerta y entraron Mosquito, Mani y Chago Quiles. Mosquito sacó un arma y él se asustó y salió fuera del apartamento hacia la escalera del edificio. Allí se sentó y, al rato, vio salir a Tatito. Éste regresó como a los quince (15) o veinte (20) minutos y volvió a entrar al apartamento. Al rato salió Mosquito y le pidió como favor que sacara a sus amigos del caserío porque ellos se habían fugado de la Escuela Industrial de Mayagüez. Natito le dijo que estaba bien, que los sacaría en su carro, un Datsun rojo de cuatro (4) puertas. Testificó que no conocía a Mani ni a Chago Quiles con anterioridad a ese día, el día en que Mosquito se los presentó en el carro. Mani y Chago le indicaron que los dejara en casa de Manolete y que luego se fuera. El testigo así lo hizo. Al regresar al residencial, una de las residentes le dijo que esos individuos habían asesinado a Félix El Grande. Atestó que durante todo el tiempo que estuvo en casa de Tatito nunca vió allí al apelante. Adujo que no informó nada de esto a la Policía por temor a que lo acusaran a él también por ayudar a los autores del asesinato.

Luego de que el Ministerio Público y la defensa rindieran sus respectivos informes al Jurado, el juez de instancia leyó a éste las instrucciones del Manual de Instrucciones al Jurado sobre los posibles veredictos a rendirse. Hecho esto, el juez de instancia le preguntó a las partes si tenían al-

guna objeción, a lo que éstas contestaron en la negativa. El Jurado se retiró a deliberar y, al anunciar que deseaba regresar a Sala y al reabrirse la sesión, la defensa del apelante solicitó que se impartieran nuevas instrucciones. El juez las denegó por considerar la solicitud tardía.

Con esa evidencia el Jurado rindió un veredicto de culpabilidad en todos los cargos contra el apelante.

### III

Discutiremos, en primer lugar, los errores planteados por el apelante en su recurso de apelación para luego considerar la procedencia de la moción de nuevo juicio.

Como primer señalamiento de error plantea el apelante que el veredicto en este caso fue contrario a la prueba, toda vez que ésta establece una duda razonable en cuanto a la culpabilidad del convicto. No tiene razón.

Reiteradamente hemos sostenido que todo acusado de delito público tiene derecho a que el Ministerio Público demuestre su culpabilidad más allá de *duda razonable* en un juicio público, justo e imparcial. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; *Pueblo v. Robles González*, 125 D.P.R. 750 (1990); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986). Esta concretización práctica de la presunción de inocencia es parte del debido proceso de ley. *In re Winship*, 397 U.S. 358 (1970); *Pueblo v. Cruz Granados*, 116 D.P.R. 3, 25 (1984), opinión del Juez Asociado Señor Negrón García.

La duda razonable es aquella insatisfacción o intranquilidad en la conciencia del juzgador de los hechos sobre la culpabilidad del acusado una vez desfilada la totalidad de la prueba del pueblo. *Pueblo v. Robles González*, supra; *Pueblo v. Toro Rosas*, 89 D.P.R. 169, 175 (1963). "Esa prueba, además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación." *Pueblo v. Carrasquillo*

*Carrasquillo*, 102 D.P.R. 545, 552 (1974). Véanse, además: Regla 10(C) de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Narváez Narváez*, 122 D.P.R. 80 (1988).

En el caso de autos el veredicto del Jurado tuvo que fundamentarse en la declaración del coautor Héctor Manuel Delgado Rivera, ya que éste fue el único testigo de cargo que conecta al apelante con los hechos. Al Jurado se le instruyó que ese testimonio debía ser considerado con desconfianza. Regla 156 de Procedimiento Criminal, *supra*. Este testimonio claramente confligía con el de los testigos de la defensa. Por un lado, el coautor sostuvo que el apelante lo contrató a él y a Chago Quiles para que asesinaran a Félix El Grande a cambio de $500 y un paquete de droga; que el motivo fue eliminar la competencia y obtener la supremacía en la venta de drogas en el Residencial Virgilio Dávila de Bayamón; que el apelante se reunió con ellos en el apartamento de Tatito luego del crimen, les hizo entrega de la paga y retuvo el reloj "Juvenia" perteneciente al occiso para venderlo y luego pagarle los $2,000, y que luego buscó un auto y los sacó del residencial público para llevarlos a casa de Manolete.

Por otra parte, los testigos de la defensa sostuvieron que luego de matar a Félix El Grande los coautores Mani y Chago Quiles, en compañía de Mosquito, fueron al apartamento y admitieron haber matado a Félix. Ambos testigos trataron de establecer que el motivo del asesinato fue el robo, que el apelante nunca fue al apartamento de Tatito y que fue Natito en su auto —y no el apelante— quien sacó del residencial a los autores materiales del crimen.

Claramente ambas versiones son irreconciliables. Una de las dos (2) es falsa. El Jurado claramente le dio crédito a la versión del coautor, a pesar de haber sido advertidos de que examinaran el mismo con desconfianza. No le dio crédito a la versión de los testigos de defensa. El veredicto condenatorio así lo demuestra.

Es norma trillada que los jueces de instancia y los Ju-

rados normalmente están en mejores condiciones de aquilatar la prueba oral. Tienen la ventaja de ver y escuchar directamente a los testigos y, por ello, sus determinaciones sobre credibilidad merecen gran respeto. *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988); *Pueblo v. Nevárez Virella*, 101 D.P.R. 11 (1973). De ordinario, esa determinación de credibilidad en un juicio por jurado sólo será alterada por este Foro ante parcialidad o error manifiesto en la evaluación que dicho Jurado haga sobre la evidencia sometida por las partes —*Pueblo v. Millán Meléndez*, 110 D.P.R. 171 (1980); *Pueblo v. López Ramos*, 96 D.P.R. 699, 703 (1968); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608, 621 (1981); *Pueblo v. Cabán Torres*, supra, págs. 653–654— porque dichos juzgadores no están inmunes al error. *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 551.

Corresponde al apelante demostrar que procedía nuestra intervención con el fallo condenatorio. *Pueblo v. Cabán Torres*, supra, pág. 654. Aquí no encontramos la parcialidad o el error manifiesto necesario para rechazar las determinaciones del Jurado.

Una lectura de la exposición narrativa de la prueba, certificada como correcta por el tribunal de instancia, es todo lo que se necesita para concluir que la prueba presentada en este caso por el Ministerio Público —la que fue creída por el Jurado— es más que suficiente para sostener las conclusiones decretadas contra el apelante, más allá de duda razonable, por los delitos, que le fueron imputados en la acusación. Dicha prueba no solo versa sobre todos los elementos de esos delitos, sino que conecta al apelante y establece su responsabilidad como autor intelectual de los mismos por cuanto conspiró, instigó, indujo y ayudó a los autores materiales en la comisión de los hechos antes, durante y después de los mismos. El error no fue cometido.

## IV

Como segundo error([4]) sostiene el apelante que erró el foro de instancia al no permitirle a su defensor explicar al Jurado la Regla 156 de Procedimiento Criminal, *supra*, en cuanto al testimonio del cómplice. Aduce que durante el informe de la defensa al Jurado, ésta trato de leerle la Regla 156, *supra*, con el propósito de explicarle la forma y manera en que debía tomar el testimonio del coautor, y el foro de instancia no se lo permitió aduciendo que en las instrucciones al Jurado el tribunal impartiría esa instrucción. Así lo hizo el foro de instancia. Sin embargo, el apelante alega que el no permitirle ese "derecho" conllevó que el Jurado no entendiera la forma y manera en que debían examinar la declaración del único testigo que lo conectaba con los hechos, privándolo así de un juicio justo e imparcial.

El señalamiento resulta inmeritorio. El juez que preside la vista en un juicio por jurado tiene amplia discreción para dirigir la etapa de los informes y la argumentación de las partes ante el Jurado. *Pueblo v. Dones Arroyo*, 106 D.P.R. 303, 312 (1977). Éste puede permitir a la defensa o al fiscal que argumenten en sus informes sobre la ley aplicable al caso siempre que tal exposición de la ley sea correcta y no tienda a confundir al Jurado.

En *Pueblo v. Colón*, 65 D.P.R. 760, 765 (1946), expresamos que:

> Desde que se resolvió el caso de *El Pueblo v. Salinas*, 9 D.P.R. 371, 375, se estableció en esta jurisdicción la regla de *que los abogados no tienen derecho a leer al jurado libros de leyes.*
> En el caso de *People v. Onessimo*, 224 Pac. 101, 102 (Cal. 1924), se dijo por la corte que por regla general la práctica de permitir a los abogados leer la ley al jurado, no es una buena y no debe

---

([4]) El apelante, en su alegato, desistió de discutir los errores numerados en su apelación como segundo y tercero, por lo que no venimos obligados a considerarlos. *Pueblo v. Dieppa Beauchamp*, 115 D.P.R. 248 (1984).

ser tolerada, puesto que el resultado por lo general, *es confundir*, más bien que ilustrar, al jurado. (Énfasis suplido.)

Más aún, la solicitud de la defensa de explicar el alcance de la Regla 156 de Procedimiento Criminal, *supra*, en este caso resultaba en una innecesaria repetición, con el riesgo de confundir al Jurado.

La instrucción del juez al Jurado sigue esencialmente la instrucción con relación al testimonio del coautor dispuesta en el Manual de Instrucciones al Jurado. Esta instrucción recoge lo dispuesto en la Regla 156 de Procedimiento Criminal, *supra*, y en nuestra jurisprudencia interpretativa al respecto —*Pueblo v. Montalvo Acevedo*, 83 D.P.R. 727 (1961); *Pueblo v. Agosto Castro*, 102 D.P.R. 441-443 (1974)— y goza de una presunción de corrección. *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988).

El juez en este caso instruyó al Jurado de una manera clara y sencilla sobre el alcance de la Regla 156 de Procedimiento Criminal, *supra*, en cuanto al testimonio del coautor. Eso era lo que pretendía lograr la defensa. En nada se perjudicó el acusado con que no se le permitiera a su defensa hacer lo que posteriormente, y con menor probabilidad de confundir al Jurado, hizo el juez que presidía el juicio. No abusó de su discreción el magistrado al así limitar la argumentación de la defensa sobre el derecho aplicable al caso.

## V

Señala el apelante, como tercer error, que las instrucciones al Jurado no fueron claras ni precisas, creando así confusión al jurado.[5]

---

[5] Este señalamiento de error también se levanta en la moción de nuevo juicio del apelante, por lo que lo aquí discutido aplica también a ese señalamiento en los errores aducidos por el apelante en su solicitud de *certiorari* sobre la denegación del nuevo juicio.

En primer lugar, sostiene el apelante que el juez que presidía la vista cometió un error al instruir al Jurado que "[u]n solo testigo que le mereciere entero crédito es suficiente para probar cualquier hecho" (alegato del apelante, pág. 19) sin especificarle nuevamente que el testimonio del coautor había que examinarlo con cautela. Según el apelante, esto provocó que el Jurado equiparara el testimonio del coautor al de un testigo común y corriente.

En segundo lugar, aduce el apelante que el juez no le expresó al Jurado los posibles veredictos que podían traer en el caso. El error no fue cometido. Veamos.

En autos, las instrucciones que se le brindaron al Jurado fueron leídas del Manual de Instrucciones al Jurado para el Tribunal Superior de Puerto Rico. Por lo tanto, gozan de una presunción de corrección. *Pueblo v. Mattei Torres*, supra. De acuerdo con estas instrucciones, se expresó al Jurado los posibles veredictos que deberían ser rendidos en el caso: culpable o no culpable. El apelante sostiene que el juez de instancia no impartió la instrucción de que los miembros del Jurado podían traer un veredicto de culpabilidad en unos cargos y de no culpabilidad en otros. Sin embargo, al finalizar las instrucciones al Jurado, el juez que presidía la vista le preguntó a las partes si tenían alguna objeción a las instrucciones impartidas. *Las partes contestaron que no*. El Jurado estuvo deliberando por algún tiempo, y al anunciar que deseaba regresar a Sala y al reabrirse la sesión es que la defensa solicita que se le imparta esa nueva instrucción.

El tribunal de instancia determinó que el planteamiento de la defensa era tardío. No incurrió en error al así resolver.

Hemos dicho que el propósito de las instrucciones al Jurado es el de ilustrar y familiarizar a ese Cuerpo con unas normas básicas de derecho. De ahí que éstas deben ser claras, consistentes, precisas y lógicas. *Pueblo v. Andrades González*, 83 D.P.R. 849 (1961).

Resulta inmeritorio el señalamiento del apelante de que el juez debía repetir la instrucción sobre el testimonio del coautor, luego de instruir al Jurado que el testimonio de un solo testigo que le mereciera crédito era suficiente para probar cualquier hecho. Olvida el apelante que una convicción puede sostenerse a base del testimonio de un coautor cuando el mismo no es "flaco y descarnado" y establece todos los elementos del delito. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988). Esto es, el hecho de que el testimonio del coautor sea examinado con desconfianza no es óbice para que el Jurado le dé crédito. De ser así, tal testimonio sería suficiente para probar cualquier hecho. No resulta, pues, incompatible brindar por separado una y otra instrucción, pues con ello no se equipara el testimonio del coautor al de un testigo común y corriente. Todo depende de la credibilidad que le da el Jurado al testimonio, pues a un coautor puede darle crédito, luego de examinar su testimonio con cautela, y no darle crédito a un "testigo común y corriente" a quien la ley no le impone el examen cauteloso de su testimonio.

Además, reiteradamente hemos sostenido que la repetición innecesaria de las instrucciones puede producir confusión en la mente de los oyentes. *Pueblo v. Velázquez Caraballo*, 110 D.P.R. 369, 374 (1980).

Por otro lado, el tribunal debe instruir apropiadamente al Jurado sobre todas las cuestiones sometidas ante su consideración y debe ofrecerle las instrucciones sobre posibles veredictos a la luz de la prueba admitida en el juicio. *Pueblo v. González Colón*, 110 D.P.R. 812 (1981).

Ahora bien, resulta tardío un planteamiento hecho por la defensa a los efectos de que el tribunal había dado al Jurado únicamente parte de las instrucciones solicitadas por el acusado, cuando tal planteamiento *se hace después de haberse retirado dicho Jurado a deliberar. Pueblo v. Saenz Forteza*, 100 D.P.R. 956 (1972). *Mucho más tardío el*

*de este caso, que se hizo cuando ya el Jurado traía su
veredicto.*

## VI

*¿Procedía la concesión de un nuevo juicio ante la ale-
gada nueva evidencia descubierta por el apelante?*([6])

El 14 de agosto de 1987 el peticionario presentó una
moción de descubrimiento de prueba en virtud de lo dis-
puesto en la Regla 95 de Procedimiento Criminal, 34
L.P.R.A. Ap. II. En el párrafo tercero, inciso (C), de dicha
moción, solicitaba del Ministerio Público una "[c]opia del
acuerdo o información al respect[o e]ntre el testigo Héctor
Manuel Delgado Rivera y la Fiscalía de Bayamón me-
diante el cual el testigo Héctor Manuel Delgado Rivera se
hizo testigo del Pueblo". *Exhibit* III. El Ministerio Público
nunca contestó este requerimiento de la defensa. No aceptó
ni negó la existencia del acuerdo. Adoptó una posición pa-
siva ante el descubrimiento de prueba pre-juicio. Durante
el juicio surgió un incidente, certificado por el juez de ins-
tancia, cuando la defensa interrogaba al agente Albino. La
defensa preguntó a este testigo si conocía de la existencia
de un acuerdo entre el coautor Héctor M. Delgado y la Fis-
calía para que aquél declarase en contra del apelante. El
agente Albino contestó que desconocía la existencia de al-
gún acuerdo con el coautor. En ese momento el Fiscal Julio
Soto manifestó al tribunal de instancia que él no participó
en el proceso seguido contra el coautor Delgado Rivera y
que no sabía si hubo acuerdo o no entre el testigo y la
Fiscalía. Así lo indicó a los miembros del Jurado el juez que

---

([6]) Circunscribimos nuestro examen a la posible procedencia de un nuevo juicio,
por cuanto el efecto de la alegada nueva prueba en este caso sólo tiene el efecto de
atacar o afectar la credibilidad que le mereció al juzgador de los hechos el testimonio
del coautor Héctor M. Delgado Rivera. Tal prueba, por sí sola, no puede derrotar la
determinación que sobre la culpabilidad del acusado hizo el juzgador de los hechos a
nivel de instancia, de suerte que nos permita decretar la absolución total del ape-
lante peticionario. *Pueblo v. Morales Rivera*, 115 D.P.R. 107, 109–110 (1984).

presidía el proceso, instruyéndoles que "[n]o hay escrito alguno sobre la información que se nos [h]a comentado de acuerdo entre el Ministerio Público y el señor conocido por Mani. Cualquier testimonio [en] ese sentido se habrá de hacer al señor Héctor Manuel Delgado Rivera ... al momento que venga a declarar. A este momento el fiscal Soto no intervino en ese proceso y desconoce si hay acuerdo alguno entre fiscalía y ese testigo". *Exhibit* IV.

Durante el contrainterrogatorio a Mani, éste negó que existiera un acuerdo con la Fiscalía para que él declarara contra el apelante a cambio de que se le acusara por asesinato en segundo grado y se solicitara la pena mínima de ese delito (doce (12) años).

Tanto el Fiscal que presentó la prueba de cargo contra el apelante (Fiscal Soto) como el que continuó el proceso contra el testigo de cargo (Fiscal José Aponte) desconocían de la existencia del acuerdo. Conforme a la versión del Fiscal Aponte en la vista sobre la moción de nuevo juicio, ello se debió a que el Fiscal que inició el proceso contra Mani (el entonces Fiscal Luis Jiménez Reverón) concertó dicho acuerdo con el testigo, pero cuando aquél renunció a su cargo de Fiscal, aparentemente no le informó a sus sucesores de la existencia del acuerdo. La situación se complicó por el hecho de que, según el testimonio del Honorable Juez Ortiz Juan, dicho acuerdo fue sellado y guardado en la bóveda del tribunal para seguridad del testigo.

Ante estas circunstancias, debemos concluir que el Ministerio Público actuó de buena fe al informar su desconocimiento del acuerdo entre el testigo principal de cargo y el Estado. Recuérdese que el fiscal de sala adujo, en todo momento, desconocer la existencia del acuerdo. Así lo expresó, además, el agente Albino en su testimonio. Sólo el propio testigo de cargo negó la existencia del acuerdo.

En el caso de autos, al igual que en *Giglio v. United States*, 405 U.S. 150 (1972), al testigo principal y coautor del delito se le había ofrecido un acuerdo —para que decla-

rara en contra del acusado— por otro miembro del Ministerio Público y con el desconocimiento del Fiscal que desfiló la prueba de cargo. Este hecho no tiene efecto alguno al determinar si al acusado se le violó el debido proceso de ley, puesto que lo que realmente cuenta no es la buena intención o mala fe, o el conocimiento o desconocimiento del acuerdo por parte del Fiscal que presentó la prueba de cargo, sino la posibilidad de daño al acusado y cómo tales hechos pudieran variar el veredicto del Jurado. *Pueblo v. Hernández García*, 102 D.P.R. 506, 508–509 (1974); *United States v. Agurs*, 427 U.S. 97, 104 (1976). Después de todo, la Oficina del Ministerio Público es una sola entidad y las promesas hechas por uno de sus abogados vinculan al Estado. *Giglio v. United States*, supra, pág. 154. Su buena o mala fe, conocimientos o desconocimientos no los libera de su obligación constitucional de revelar prueba relevante a la inocencia del acusado o a su castigo. *Brady v. Maryland*, 373 U.S. 83 (1963); *Giles v. Maryland*, 386 U.S. 66 (1967); *United States v. Agurs*, supra, pág. 97; *Pueblo v. Rodríguez Sánchez*, 109 D.P.R. 243 (1979).

Esa obligación del Ministerio Público responde, en esencia, a que el interés principal del Estado en una causa criminal no es ganar un caso, sino que se haga justicia. *Pueblo v. Delgado López*, 106 D.P.R. 441, 444 (1977). Por ello, desde *Brady v. Maryland*, supra, el Tribunal Supremo federal dejó establecido que en casos estatales el Ministerio Público viola el debido proceso de ley de la Emda. XIV, Const. EE. UU., L.P.R.A., Tomo 1, a un acusado cuando oculta, suprime u omite evidencia favorable que solicita la defensa y que es *relevante a la inocencia* o al castigo de dicho acusado. Esto es independiente de la buena o mala fe del Ministerio Público al así actuar. Véanse, además: *Giles v. Maryland*, supra; Comentarios, *Materiality and Defense Requests: Aids in Defining the Prosecutor's Duty of Disclosure*, 59 (Núm. 1) Iowa L. Rev. 433 (1973); Comentarios, *Brady v. Maryland and the Prosecutor's Duty to Disclose*,

40 (Núm. 1) U. Chi. L. Rev. 112 (1972); R.J. Traynor, *Ground Lost and Found in Criminal Discovery*, 39 N.Y.U. L. Rev. 228 (1964). Esa norma fue extendida a los acusados por delitos federales protegidos por la Emda. V, Const. EE. UU., *supra —United States v. Agurs*, supra— y adoptada en nuestra jurisdicción en *Pueblo v. Hernández García*, supra, *Pueblo v. Delgado López*, supra, y en *Pueblo v. Rodríguez Sánchez*, supra. Se ha sostenido igualmente que la evidencia para impugnar la credibilidad de un testigo principal de cargo[7] es evidencia incluida en la norma de *Brady v. Maryland*, supra, ya que puede ser evidencia favorable al acusado, que de ser revelada y efectivamente utilizada por la defensa, puede hacer la diferencia entre su convicción o su absolución. *Giglio v. United States*, supra. La supresión de tal evidencia por parte del Ministerio Fiscal privaría al acusado de un juicio justo. *United States v. Bagley*, 473 U.S. 667 (1985); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Sin embargo, no toda evidencia para impugnar la credibilidad de un testigo principal de cargo —no revelada al acusado durante el juicio y descubierta por éste con posterioridad a él— requiere automáticamente la concesión de un nuevo juicio. Se requiere determinar que tal evidencia es *relevante*, esto es, que su supresión socava la confianza en el resultado del juicio. *United States v. Bagley*, supra, pág. 678.

Según este principio, el tribunal apelativo sólo revocará una sentencia y ordenará un nuevo juicio cuando se haya cometido un error constitucional (*constitutional error*) al suprimir tal evidencia. Debemos recordar que "[n]o todo

---

[7] Se ha sostenido, además, que la evidencia alegadamente suprimida debe ser útil para impugnar la credibilidad de un testigo de cargo principal o clave y no de cualquier testigo de cargo. Ello es así, ya que sólo la evidencia para impugnación de la credibilidad de este tipo de testigo es relevante a la inocencia o culpabilidad del acusado y puede variar el fallo o veredicto. *Giglio v. United States*, 405 U.S. 150 (1972).

error que afecte derechos constitucionales de la parte afectada acarrea revocación. Es decir, la admisión o exclusión errónea puede afectar derechos constitucionales y el error ser considerado no perjudicial en el sentido de que de no haberse cometido el error el resultado aparentemente hubiera sido el mismo". E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, págs. 9–10.

De suerte que un error constitucional puede ser "no perjudicial" (*harmless error*) si el tribunal apelativo queda convencido de ello más allá de duda razonable. *Chapman v. California*, 386 U.S. 18 (1967); *Pueblo v. Ríos Álvarez*, 112 D.P.R. 92 (1982).

Es norma para determinar la relevancia de la evidencia impugnatoria favorable al acusado, y suprimida por el Ministerio Público, el examinar *"si existe una probabilidad razonable de que si tal evidencia hubiera sido divulgada a la defensa durante el juicio, el resultado del procedimiento habría sido diferente*. Una probabilidad razonable es aquella probabilidad suficiente para socavar la confiabilidad en el resultado". (Traducción nuestra.) *United States v. Bagley*, supra, pág. 682.

Si el tribunal apelativo queda convencido de la existencia de esa probabilidad razonable, esto es, de la relevancia de la evidencia, y queda demostrado que el Ministerio Público indujo a la defensa a no impugnar al testigo principal (a base de interés en su testimonio, etc.) por omisión, respuesta errónea o supresión de tal evidencia relevante sobre un acuerdo, arreglo, promesa o recompensa a dicho testigo por su testimonio, debe entonces revocar la convicción y ordenar un nuevo juicio. Dicho en forma sencilla: la evidencia impugnatoria de la credibilidad de un testigo principal de cargo (*relevante* y *favorable al acusado*) que es negada, ocultada o suprimida por el Ministerio Público, deviene en un error constitucional que acarrea la revocación de la

convicción. El error constitucional consiste en tales circunstancias, en no ofrecerle al acusado un juicio justo.

Si, por el contrario, el tribunal apelativo queda convencido más allá de duda razonable de que no existe dicha probabilidad razonable de un veredicto distinto aun cuando el Fiscal haya ocultado, inducido a error o suprimido la evidencia impugnatoria favorable a la defensa, debe confirmar la convicción y denegar el nuevo juicio. Ello es así, ya que aun cuando se haya ocultado tal evidencia puede que ésta no sea relevante en el sentido que hemos definido. En tal caso, aparte de lo censurable que haya sido la conducta del Ministerio Público, sólo se habría cometido un error sin perjuicio (*harmless error*). En este sentido, la evidencia irrelevante ocultada a la defensa sería sólo un error sin perjuicio alguno para el acusado y sin ulteriores efectos sobre la convicción. Véanse: Anotación, *Prosecutor's Duty, under Due Process Clause of Federal Constitution, to Disclose Evidence Favorable to Accused—Supreme Court Cases*, 87 L.Ed.2d 802, 810; *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 (1987); *Patillo v. Georgia*, 102 L.Ed.2d 367, *cert.* denegado, 488 U.S. 948, 949–950 (1988), opinión disidente del Juez Marshall; Anotación, *Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction*, 34 A.L.R.3d 16, 47–52; *Coleman v. Maxwell*, 399 F.2d 662 (6to Cir. 1968), *cert.* denegado, 393 U.S. 1058 (1969).

Por otro lado, es norma trillada de este Tribunal que la moción de nuevo juicio fundada en el descubrimiento de nueva prueba procede cuando la misma: (1) no se pudo descubrir con razonable diligencia antes del juicio; (2) no es meramente acumulativa; (3) no impugna la prueba aducida durante el juicio; (4) es creíble, y (5) probablemente

producirá un resultado diferente. *Pueblo v. Rivero Lugo y Almodóvar*, supra, y casos allí citados.([8])

Para examinar un reclamo de nueva prueba de carácter impugnatorio de la prueba producida en el juicio, en casos como el de autos, debemos aplicar los criterios esbozados en *Giglio v. United States*, supra, y en *United States v. Bagley*, supra. Ello, ya que, aun cuando la alegada nueva prueba va dirigida a impugnar la prueba de cargo aducida en el juicio, implica el derecho del acusado a un juicio justo en donde se le garantice el debido proceso de ley frente a la conducta del representante del Estado. *Pueblo v. Hernández García*, supra, págs. 510–511.

Bajo las circunstancias de autos, tenemos que concluir que se cometió error al no suplirle a la defensa el acuerdo entre el Ministerio Público y el testigo principal de cargo. Aquí la defensa hizo un requerimiento específico del acuerdo. El testigo insistentemente negó la existencia del mismo.

Ahora bien, estamos convencidos, más allá de duda razonable, de que dicho error no perjudicó al acusado y de que aun cuando el juzgador de los hechos hubiera tenido ante sí el acuerdo, el resultado habría sido el mismo.

En primer lugar, ante la actitud pasiva del Ministerio Público, la defensa debió haber reproducido su solicitud de descubrimiento de prueba pre-juicio durante el juicio en su fondo. Así habría cumplido con la diligencia necesaria que requiere nuestra jurisprudencia para conceder un nuevo juicio. Adviértase que la existencia del acuerdo y sus términos surgían de la Minuta de 29 de abril de 1987 y el juicio del peticionario comenzó en noviembre de 1987. Con esa minuta, que desde abril estaba disponible para el acusado, se podía impugnar el testimonio del testigo principal

---

([8]) La moción de nuevo juicio va dirigida a la discreción del tribunal sentenciador. Si dicho foro la deniega, su determinación debe ser respetada, salvo que se le demuestre al foro apelativo un claro e inequívoco abuso de discreción por parte del foro de instancia. *Pueblo v. Prieto Maysonet*, 103 D.P.R. 102 (1974).

de cargo. Contrario al caso ante nos, en *Giglio v. United States*, supra, la prueba impugnatoria de la credibilidad del testigo principal de cargo sólo pudo ser obtenida con razonable diligencia, posterior a la convicción.

En segundo lugar, en las circunstancias de este caso, el acuerdo entre el testigo principal de cargo y el Ministerio Público era irrelevante, esto es, no existía una probabilidad razonable de que aun cuando se revelara el acuerdo para impugnar la credibilidad del testigo principal, el juzgador de los hechos llegara a un resultado distinto.

La defensa solicitó el acuerdo con la intención de impugnar el testimonio del testigo principal de cargo por interés en el resultado. Sin embargo, como acepta la defensa del apelante, el referido acuerdo se vino a configurar el 25 de marzo de 1988, esto es, cuatro (4) meses después de que dicho testigo atestara contra el apelante. Al momento de testificar, el referido testigo había sido condenado a treinta y cinco (35) años de prisión por la muerte de Félix El Grande y no a doce (12) años, como era el acuerdo. De ahí que se explique por qué el testigo insistentemente negó la existencia del acuerdo.

En tercer lugar, la defensa contrainterrogó extensamente a dicho testigo sobre su interés en testificar contra el apelante. Nos parece sumamente convincente su expresión de que el apelante "lo había usado, ya que él era adicto y por lo tanto debía pagar". Relación narrativa de la prueba desfilada, pág. 8.

En cuarto lugar, aquí no estamos ante un testigo de cargo que se caracterice por su buena reputación en la comunidad. Aquí el Jurado escuchó a este testigo narrar su vida delictiva desde temprana edad. Lo escuchó señalar que estuvo recluido en una institución correccional juvenil; que era un adicto crónico; que se dedicaba a matar personas a cambio de dinero y drogas, y que en su vida como gatillero había matado a cinco (5) o a seis (6) personas.

El juzgador de hechos oyó a ese testigo relatar con una ·

pasmosa tranquilidad el sangriento crimen de Félix El Grande desde su etapa de planeamiento, realización y posterior huida del residencial. Los detalles sobraron. Sobre cada una de esas actividades y sobre cada una de las fases del asesinato de Félix El Grande la defensa contrainterrogó incisivamente a este testigo, tratando de impugnar su versión y la conexión del acusado con ese crimen.

Sobrados fundamentos para impugnar el testimonio de este testigo tuvo la defensa y utilizó efectivamente cada una de ellas. El Jurado dirimió ese conflicto en su contra y no tenemos dudas de que aun cuando tuviera ante sí los términos del acuerdo entre ese testigo y el Ministerio Público, el veredicto habría sido el mismo. Este Jurado le dio mayor credibilidad a la teoría del Ministerio Público de que el asesinato de Félix El Grande (un "tirador" de drogas) fue planeado y ejecutado por el apelante con motivo de un plan concertado con dicho testigo y otras personas para quedarse con el control del trasiego de estupefacientes en el residencial Virgilio Dávila de Bayamón.

El error cometido por el Ministerio Público, de no revelar el acuerdo, no fue perjudicial al acusado. Por lo tanto, no amerita revocación de su condena ni la celebración de un nuevo juicio.

### La declaración jurada postsentencia prestada por Mani

Finalmente, el apelante avaló su solicitud de nuevo juicio con una declaración jurada prestada por Mani, donde éste sostiene que el testimonio ofrecido durante el juicio contra el apelante era falso. En dicha declaración jurada, así como en la vista para discutir la moción de nuevo juicio, atestó que el caso contra el apelante había sido fabricado por el agente Albino y por el Fiscal Soto, pues éstos deseaban "sacarlo de carrera". Declaró, además, que la persona responsable y autora intelectual de la muerte de Félix El Grande era la viuda de Manolete, quien los contrató (a él y

a Chago Quiles) para que lo mataran y así vengar la muerte de su esposo Manolete. Desmintió que le hubiera dicho al Fiscal Aponte que lo afirmado en la declaración jurada era falso.

Por su parte, el Fiscal de Distrito José Aponte testificó que, luego de haber prestado la declaración jurada, Mani le expresó que lo allí expresado era falso; que la había prestado por sentirse presionado en el penal, ya que en ese entonces había sido movido a un área del presidio donde estaba expuesto a la población carcelaria y a los amigos del apelante que lo habían amenazado de muerte.

El foro de instancia expresó en la resolución que denegaba el nuevo juicio que el comportamiento exhibido por el testigo durante el juicio y el demostrado en la vista relativa a la moción de nuevo juicio eran diametralmente opuestos. En el juicio, según el magistrado, demostró aplomo y seguridad, mientras que en la vista evidenciaria se manifestó inseguro y ambivalente. Ante ese comportamiento, el magistrado concluyó que su nueva versión de los hechos no era creíble.

Aduce el apelante que "[c]laramente la función del magistrado en una Moción de Nuevo Juicio no debe de ser la de dirimir conflictos de prueba, ya que esa función le corresponde única y exclusivamente al nuevo jurado, máxime cuando ya ese Juez le ha impuesto una pena de 119 años al convicto de este caso y ya había participado en el juicio en que resultó convicto". Petición de *certiorari*, pág. 18.

El argumento del apelante carece de méritos. Desde 1946 resolvimos en *Pueblo v. Morales*, 66 D.P.R. 10, 21 (1946), que es al juez sentenciador a quien corresponde dirimir los conflictos sobre la credibilidad entre la versión de un testigo en el juicio y la versión ofrecida por la nueva prueba en la vista sobre la moción de nuevo juicio.

En el caso ante nos existe evidencia suficiente para sostener la determinación del juez de instancia de no darle

crédito a la nueva versión de Mani. El hecho de que éste hubiera intentado fugarse de la cárcel en más de una ocasión (por temer por su seguridad), unido al hecho de que parte del acuerdo era obtener un arreglo con la Administración de Corrección para colocarlo en una institución que garantizara su seguridad, corrobora la versión del Fiscal Aponte de que el testigo prestó la declaración temiendo por su seguridad y que lo así atestado era falso. Además, el magistrado, quien observó el comportamiento del testigo durante el juicio y la inconsistencia demostrada en la vista sobre nuevo juicio, estaba en mejor posición para dirimir ese conflicto.

Finalmente, debemos destacar que la nueva versión introducida en la vista era, por sí, de naturaleza impugnatoria de su versión original. Conforme a lo dispuesto en nuestra jurisprudencia, la prueba que da paso al nuevo juicio no puede impugnar la aducida en el juicio. No erró, pues, el foro de instancia al denegar la solicitud de nuevo juicio por este fundamento.

Por los fundamentos expuestos, *se dicta sentencia que confirma las convicciones del apelante, se expide el auto de "certiorari" y se confirma la resolución del foro de instancia que deniega la solicitud de nuevo juicio.*

Así lo pronunció y manda el Tribunal y certifica el señor Sub Secretario General. El Juez Presidente Señor Pons Núñez disintió sin opinión escrita. El Juez Asociado Señor Rebollo López disintió mediante opinión escrita, a la cual se unió el Juez Asociado Señor Andréu García. Los Jueces Asociados Señores Negrón García y Hernández Denton concurrieron con el resultado sin opinión escrita.

(*Fdo.*) Heriberto Pérez Ruiz
*Sub Secretario General*

## – O –

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Andréu García.

Conforme correctamente se expresa en la sentencia mayoritaria emitida por el Tribunal en el presente caso: el Ministerio Público tiene la "obligación constitucional" de revelarle a un imputado de delito aquella prueba en su poder que pueda beneficiarle a éste; que cuando el Estado oculta, suprime u omite evidencia favorable a la defensa de un imputado de delito, se incurre en una violación del debido procedimiento de ley, independiente-mente del hecho de que el Estado haya actuado o no de buena fe; que esta norma incluye evidencia constitutiva de prueba de impugnación de la credibilidad de un testigo, constituyendo la supresión de esta clase de evidencia una violación al derecho de todo imputado de delito de su derecho a tener un juicio justo e imparcial, y que la norma antes expuesta responde a la premisa de que el interés del Estado, en representación de la ciudadanía en general, es de que se haga justicia. *Brady v. Maryland*, 373 U.S. 83 (1963); *Giles v. Maryland*, 386 U.S. 66 (1967); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667 (1985); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *Pueblo v. Hernández García*, 102 D.P.R. 506 (1974); *Pueblo v. Delgado López*, 106 D.P.R. 441 (1977); *Pueblo v. Rodríguez Sánchez*, 109 D.P.R. 243 (1979).

En el presente caso *no* hay la más mínima duda, ni controversia, sobre el hecho de que el Estado —*a pesar de la existencia de un requerimiento específico de la defensa a esos efectos*— ocultó, suprimió u omitió informarle a la defensa sobre el hecho de que el *único testigo* de cargo que conecta al aquí apelante con los hechos que le imputan a

éste *había entrado en un acuerdo con el Estado de declarar contra el apelante a cambio de que se le rebajara la calificación del delito y ser sentenciado a una pena de prisión relativamente benévola.*

Conforme dispone la Regla 44 (B) (4) de Evidencia de 1979 (32 L.P.R.A. Ap. IV), la credibilidad de un testigo puede ser impugnada mediante la demostración de la existencia de "cualquier prejuicio, *interés* u otro *motivo de parcialidad* por parte del testigo". (Énfasis suplido.)

El "beneficio", producto del acuerdo antes mencionado, recibido por el testigo en controversia consistió, *nada más y nada menos*, en que en lugar de ser sentenciado a noventa y nueve (99) años de presidio, a éste le fue impuesta una sentencia de doce (12) años. Procede que uno se cuestione si resulta ser fundamental y determinante, en la decisión que tiene que hacer el juzgador de los hechos sobre la credibilidad que le pueda merecer, o no, un testigo de cargo, el "dato" de que ese testigo iba a recibir un beneficio de esa magnitud a cambio de su declaración adversa al aquí apelante. Esto es, si ese hecho constituía o no suficiente "interés" o aliciente que, en opinión de los señores del Jurado, pudieran haber llevado al referido testigo a implicar falsamente al apelante en el asesinato que dicho testigo cometió, todo ello con el propósito de "salvarse" de una reclusión de por vida en una institución penal.

Conforme surge de la sentencia emitida, una mayoría de los integrantes de este Tribunal contesta la referida interrogante expresando que está convencida "más allá de duda razonable, de que dicho error no perjudicó al acusado y de que aun cuando el juzgador de los hechos hubiera tenido ante sí el acuerdo, el resultado habría sido el mismo". Sentencia, pág. 354. Cómo llega a esa sorprendente conclusión, es algo que la mayoría no explica. *Dicha actuación, a nuestra manera de ver las cosas, constituye evidencia incuestionable de una peligrosa tendencia*

*por parte de este Tribunal de convertirse en "juzgador de los hechos" desde este estrado apelativo.*

En resumen, disentimos por cuanto el resultado a que se llega en el caso es uno erróneo. *De nada sirve* que en las decisiones que se emitan en los casos que vienen ante la consideración de este Tribunal se haga una exposición correcta de la ley y la jurisprudencia pertinente *si éstas son aplicadas erróneamente en los mismos.* Cuando se actúa en esta forma, no hay duda, se "ilustra" al foro y a las partes sobre el derecho aplicable; *lamentablemente, sin embargo, no se hace justicia.*